## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 17 2020, 9:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Amy D. Griner | Curtis T. Hill, Jr. |
| Mishawaka, Indiana | Attorney General of Indiana |
| | Robert J. Henke |
| | Deputy Attorney General |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of The Termination of Parental Rights of: | January 17, 2020 |
| | Court of Appeals Case No. 19A-JT-1152 |
| J.K. *(Minor Child)* | |
| and | Appeal from the Elkhart Circuit Court |
| N.G. *(Father)*, | |
| *Appellant-Respondent,* | The Honorable Michael Christofeno, Judge |
| v. | The Honorable Deborah Domine, Magistrate |
| The Indiana Department of Child Services, | Trial Court Cause No. 20C01-1812-JT-67 |
| *Appellee-Petitioner,* | |

**Robb, Judge.**

# Case Summary and Issue

[1] N.G. ("Father") appeals the termination of his parental rights to his child and presents the sole issue of whether the juvenile court's order terminating his parental rights was clearly erroneous. Concluding it was not clearly erroneous, we affirm.

# Facts and Procedural History

[2] Father and B.K. ("Mother") are the unmarried biological parents of J.K., born April 3, 2017 ("Child"). On April 4, 2017, the day after Child was born, the Department of Child Services ("DCS") received a report alleging that Mother had been admitted to the hospital to give birth and tested positive for amphetamines and cocaine upon arrival and Child also tested positive at birth.[1] Mother admitted to smoking methamphetamine three days prior. Mother stated she believed Father was the biological father of Child, but paternity had not yet been established. Mother also alleged that Father uses intravenous illegal drugs. Father went to the hospital to visit Mother and Child but the two got into an altercation and Father was removed from the property. The same day, DCS filed a request for Child's removal and the juvenile court entered an

---

[1] Ultimately, Mother voluntarily relinquished her parental rights to Child and does not participate in this appeal. Therefore, we have limited our recitation of the facts to those pertaining primarily to Father, except as necessary.

emergency custody order removing Child from Mother's care. Child was placed with his maternal grandmother, C.K.

[3] On April 5, 2017, DCS filed a petition alleging Child to be a child in need of services ("CHINS") based on Mother's substance abuse during her pregnancy and the fact that Father has been "violent around Mother and had to be escorted from the hospital after getting into a verbal altercation with Mother." Exhibits, Volume III at 30. The juvenile court subsequently entered an order appointing a court appointed special advocate ("CASA") for Child. An initial hearing on the petition was held on April 13 during which Mother and Father admitted Child was a CHINS and the juvenile court adjudicated Child as such. Due to the allegations, Father agreed to submit to a drug screen after the hearing. Father tested positive for amphetamine, methamphetamine, cocaine, and heroin and therefore, Child was not placed with Father at that time.

[4] DCS filed a pre-dispositional report recommending (among other things) that Father: maintain weekly contact with the DCS family case manager ("FCM"); establish paternity; participate in Fatherhood Engagement services and follow all recommendations; enroll in and complete any programs recommended by the FCM; obey the law; refrain from drug use; maintain suitable housing; complete parenting and substance abuse assessments; submit to random drug screens; and, upon establishing paternity and participating in substance abuse treatment, attend supervised visitation. Following a dispositional hearing on May 11, the juvenile court entered its dispositional decree adopting DCS' recommendations and further ordering Father to enroll and participate in any

services ordered within thirty days of the corresponding referral. As to the random drug screens, the court stated that any drug screen not completed in a timely manner would be considered a positive screen. *See id*. at 69-70. Around June 2017, Father ceased all contact with DCS.

[5] On September 7, 2017, DCS filed a progress report informing the court that Father: completed paternity testing and is Child's father; submitted to several DCS drug screens, which were positive for methamphetamine and opiates; failed to complete a parenting assessment, substance abuse assessment, or any treatment; failed to begin Fatherhood Engagement services; and due to the high levels of substances in his drug screens, was not allowed to participate in any supervised contact with Child. DCS also reported that Father attempted to contact Child outside of DCS approval. Further, Father had not contacted DCS, "limit[ing] DCS['] ability to monitor his progress and substance use." *Id*. at 78.

[6] Father was arrested around April 2018 on possession of narcotics charges. On July 6, 2018, DCS filed an additional progress report stating that Father was incarcerated in the St. Joseph County, Indiana, jail. At the time, Father still had not completed a parenting or substance abuse assessment and had not started Fatherhood Engagement services. On July 17, DCS filed the DNA paternity test results with the juvenile court, as well as a motion to change the permanency plan to a concurrent plan of guardianship and adoption. The juvenile court held a periodic case review hearing on July 19 and found that Father was incarcerated at the time, had not complied with Child's case plan,

and had not visited Child, cooperated with DCS, or "enhanced [his] ability to fulfill [his] parental obligations." *Id*. at 133.

[7] Father was released from jail and began work release around September 2018. In an October progress report, DCS reported that around the end of the reporting period, Father began making consistent contact with DCS. Father had been residing at the DuComb Center in South Bend, a work release program, and had completed a substance abuse assessment and attended intensive outpatient drug treatment. At the time, Father had not completed a parenting assessment and was on a waitlist for Fatherhood Engagement services. In addition, Father had tested negative on drug screens and breathalyzers. However, DCS also reported that Father had been recently arrested and re-incarcerated in the St. Joseph County jail for allegedly hiding Suboxone in a pen in his room. Later, after Father returned to work release, multiple cigarettes and a green "leafy substance rolled up in a piece of paper" were found in Father's property. Transcript of Proceedings, Volume II at 135-36. Father's placement in work release was revoked and he was sent back to jail.

[8] On December 7, 2018, DCS filed a petition to terminate Mother's and Father's parental rights. The juvenile court held an initial hearing on December 27 during which DCS informed the court that Father recently tested positive for synthetic marijuana. Father was incarcerated until March 5, 2019 and then returned to the DuComb Center. The juvenile court held a fact-finding hearing on May 10, 2019. At the outset of the hearing, Mother indicated that she

wanted to voluntarily relinquish her parental rights and she signed the required consent, which the juvenile court later accepted. Following the hearing, the juvenile court entered an order terminating Father's parental rights and found, in pertinent part:

[13.]l. [Father] only asked for visits with his son two years after [Child]'s birth, and two years after the [C]hild's CHINS case was initiated.

m.    A major part of the delay in making a request for visits was [Father]'s incarceration. Nonetheless, [his] circumstances today are the same as they were eight months ago; he could have asked for visits sooner had he been in compliance with the rules at work release.

n.    [Father] is currently placed at DuComb and he has been at the DuComb Center, which is a work release facility, since September of 2018. [S]oon after [] his placement at the center [he] was violated [sic] for "cheeking" suboxone and he was sent back to jail. He was released from incarceration on March 5, 2019 and a request was made by [Father] for a visit with [Child], for the first time, on April 18, 2019.

* * *

q.    [Father] is unable to care for [Child] while in work release.

r.    [Father]'s earliest release from work release is August of this year, four months from the date of the hearing[.] His sentence will be complete in June of 2020, so if there are violations[, Father] could be at work release for more than another year.

s.     Upon release from work release, [Father] will then be on probation in another case out of Elkhart County.

t.     [Father] has done well in the last two months while in the work release facility.  At this moment, . . . he is in compliance with the work release program and . . . the expectations of his son's CHINS case.

u.     A determination of a parent's ability to care for a child, however, requires more than consideration of the instant compliance.

v.     Since [Child] was adjudicated a CHINS, [Father] has rarely been in compliance with the expectations imposed under the CHINS case. . . . There is no dispute that [Father] has been in compliance and has been working with the DCS for the last two months.  Nonetheless, in the Review Hearing Report filed on October 30, 2018, it was reported that [Father] had just begun to make regular contact with the DCS, and still had not completed his parenting assessment and had not visited with [Child].  At the hearing held on July 19, 2018, it was reported that [Father] had not cooperated with services offered, had not enhanced his ability to parent and had not visited his son.  In a Motion to Modify the Permanency Plan filed on July 17, 2018, it was reported that [Father] had made no progress in the case since May of 2017.  In the Progress Report filed on May 16, 2018, the DCS case manager reported that [Father] had not been in contact with the DCS, had not participated in drug treatment or any other services, and had not visited [Child].  At the Permanency Hearing held on February 8, 2018, it was found that [Father] had not complied with [C]hild's case plan and had not been in contact with the DCS, and had not visited [C]hild.  At the Review Hearing on September 7, 2017, [Father] was found not to be in[]compliance with [C]hild's case plan.

\* \* \*

dd.  [Father] testified that because of incarceration, he was not ready at the time of the termination hearing to care for [Child]; specifically, at the hearing he stated that "I would not give me a chance (to care for [Child]) today."  But [Father] predicts that he will be ready.  "Will be", however is not enough.  [Child] needs a caregiver now.

ee.  Moreover, while [Father] should be commended that his drug screens have been negative since his incarceration and subsequent placement in work release, his history of drug use demands caution to protect [Child].

ff.  [Father] is currently in work release on a charge of possession of a narcotic drug.

\* \* \*

ii.  [Father] has a long history of substance abuse to overcome.  He testified that he began using marijuana and alcohol at the age of sixteen, he admits that he has used hallucinogens, benzodiazepines, and cocaine.  And before his current incarceration, [Father] admits that he was using methamphetamine daily and injecting heroin every day.  He said that he used heroin for two to three years.

jj.  [Father] testified that he is now "over drugs" because [Child] changed his world.

kk.  [Child], however, needs more than promises from the father who has visited one time in person since the day he was born.  [Child] needs someone who can care for him today, and

not at some undisclosed time in the future and someone with a longer track record of sobriety and a relationship with [Child].

Appealed Order at 6-9. Based on these findings, the juvenile court concluded:

> ll.     Based upon [Father]'s history of conduct, his history of drug use, history of incarceration and a two year history of failure to establish a relationship with [C]hild, his current promises are not enough to refute the conclusion supported by the evidence presented that the conditions resulting in removal will not be remedied and that a continuation of the parent child relationship poses a threat to the well being of [Child].

*Id*. at 9. The juvenile court also concluded that termination of Father's parental rights is in Child's best interest and a satisfactory plan for the care and treatment of Child existed. Father now appeals. Additional facts will be supplied as necessary.

# Discussion and Decision

## I. Standard of Review

[9] We begin, as we often do, by emphasizing that the right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In re D.D.,* 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied.* Although parental rights are of a constitutional dimension, they are not without limitation and the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). We

acknowledge that the parent-child relationship is "one of the most valued relationships in our culture," but also recognize that "parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 147 (Ind. 2005) (internal quotations omitted). The involuntary termination of one's parental rights is the most extreme sanction a court can impose because termination severs all rights of a parent to his or her children. *See In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. As such, termination is intended as a last resort, available only when all other reasonable efforts have failed. *Id.* The purpose of terminating parental rights is to protect children, not to punish parents. *In re D.D.*, 804 N.E.2d at 265.

[10] When reviewing the termination of parental rights, we do not reweigh the evidence or judge the credibility of witnesses. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*. Instead, we consider only the evidence most favorable to the judgment and the reasonable inferences that can be drawn therefrom. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*; *cert. denied*, 534 U.S. 1161 (2002). Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

As required by Indiana Code section 31-35-2-8(c), the juvenile court entered findings of fact and conclusions thereon. Therefore, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings, then determine whether the findings support the judgment. *Bester*, 839 N.E.2d at 147. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

## II. Termination of Father's Parental Rights

To terminate parental rights, Indiana Code section 31-35-2-4(b)(2) requires DCS to prove, in relevant part:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the foregoing elements by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). However, because subsection (b)(2)(B) is written in the disjunctive the juvenile court need only find one of the three elements in that subsection has been proven by clear and convincing evidence. *See, e.g., In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). If a juvenile court determines the allegations of the petition are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## A. Remedy of Conditions

[13] First, we note that Father does not challenge any of the juvenile court's findings; therefore, we accept the findings as true. *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997). Father contends that DCS failed to prove by clear and convincing evidence that there is a reasonable probability that the conditions that led to Child's removal and continued placement outside of his care would not be remedied because he has been sober for approximately one year, which is "strong evidence that in fact the conditions that led to the Child's removal, parental use of illegal substances, have been remedied." Appellant's Brief at 10.

[14]     In determining whether a reasonable probability exists that the reasons for removal or placement outside the home will not be remedied, we engage in a two-step analysis. *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 647 (Ind. 2015). We first identify the conditions that led to removal, then we determine whether there is a reasonable probability that those conditions will not be remedied. *Id*. With respect to the second step,

> the [juvenile] court must judge a parent's fitness to care for [his] child at the time of the termination hearing, taking into consideration evidence of changed conditions. The [juvenile] court must also evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Pursuant to this rule, courts have properly considered evidence of a parent's criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. The [juvenile] court may also properly consider the services offered to the parent by [DCS] and the parent's response to those services as evidence of whether conditions will be remedied. Finally, [DCS] is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change.

*In re I.A.,* 903 N.E.2d at 154 (quotations, citations, and emphasis omitted).

[15]     We begin with the conditions that led to removal or reasons for placement outside of the home. Here, the record reveals that DCS initially became involved because Mother tested positive for methamphetamine and cocaine upon her admission to the hospital to give birth and Child tested positive for amphetamines and cocaine shortly after birth. At the time, Child could not be

placed with Father because he tested positive for amphetamine, methamphetamine, cocaine, and opiates. We conclude that the evidence in the record supports the juvenile court's conclusion that there is a reasonable probability that the conditions that led to Child's removal and continued placement outside of Father's care will not be remedied.

[16] First, throughout all but two months of this case, Father has been non-compliant with services, demonstrating his lack of commitment. FCM Tonya Greenwood began working with the family in May 2017. At the fact-finding hearing, Greenwood testified that Father's contact with DCS "depend[ed] on the timeframe. There were different points in time of the case that he was in contact and times that he wasn't in contact." Tr., Vol. II at 162. From April 13, 2017 to early June 2017, Father maintained contact with Greenwood. However, for over one year – from early June 2017 to September 2018 – Father failed to maintain *any* contact with DCS. It was not until Father began work release around September 2018 that he reached out to DCS. Since, he has maintained "more consistent contact . . . except for when he was being held at the jail" from late December 2018 to March 2019. *Id*. Since Father returned to work release in March, Greenwood stated that he has consistently been in contact with DCS.

[17] To address Father's substance abuse issues, DCS referred Father to an intensive outpatient program ("IOP") at the inception of the case but Father did not attend. He eventually completed a substance abuse assessment through work release around August 2018, which revealed his history of using marijuana,

alcohol, hallucinogens, and more recently methamphetamine, heroin, and benzodiazepines. In the assessment, Father reported using several grams of methamphetamine per day[2] and injecting approximately one hundred dollars' worth of heroin each day. Based on Father's assessment, it was recommended that Father complete intensive outpatient treatment and Moral Recognition Treatment ("MRT"), find social support within the community, and meet with a psychiatrist to address medication issues. MRT is continuing care for drug treatment and is usually completed after a participant finishes IOP.

[18] Father attended IOP at Oaklawn but failed to complete the treatment. Lindsey Andrews, case manager at the DuComb Center, testified that Father did not finish IOP as required because Father was not participating. Father was often distracted; he constantly walked in and out of class and often complained about the legal system and Oaklawn. Andrews stated, "[i]n every IOP class, [Father] kept leaving, being on his phone. So, they just said, we're just going to [send him] straight to MRT class because it was once a week." *Id*. at 137. With respect to this lack of meaningful participation, Greenwood opined that "it seemed as though [Father] was there physically . . . but not engaging in the treatment, not taking it seriously[, which] concern[ed her] for the sustainability of his sobriety." *Id*. at 171.

---

[2] Greenwood testified that, on his assessment, Father reported using three-fourths to three grams of methamphetamine per day; however, Father testified that he did not believe "anybody could do that [much] in a day, but . . . three or four *times* a day might have been a better response." *Id*. at 223 (emphasis added).

[19] In October 2018, Father was referred to complete a parenting assessment; however, due to his work release violations, he was re-incarcerated, which delayed the process. Upon his release in March 2019, Father completed the first part of the assessment; however, under the circumstances, he was unable to complete the second part which requires Child to be present. Although Greenwood acknowledged that Father has done well in work release recently, she testified that Father's failure to complete substance abuse treatment and the parenting assessment is particularly concerning with respect to maintaining his sobriety. She stated, "given the timeline of this case, that it's been open two years, and these last two months while we have seen a lot more motivation from [Father], it is still concerning that . . . no treatment has been completed." *Id*. at 169.

[20] Second, although Father's most recent drug screen was negative and he testified that he has been attending NA meetings, he has failed to *consistently* and *independently* maintain sobriety. The evidence establishes that Father tested positive for methamphetamine, amphetamines, and opiates in April and May 2017. Then, Father did not have any contact with DCS from early June 2017 until September 2018, after he had been released from jail and placed on work release. Father tested negative in October 2018 for substances but tested positive for synthetic marijuana in December 2018. Greenwood administered approximately ten drug screens during the case but was unable to do more because Father ceased all contact for over a year. There is no question Father had done well in the two months preceding the hearing; however, Father had

not completed substance abuse treatment and his only periods of sobriety had been during his incarceration or while on work release.

[21] With respect to visitation, although we acknowledge that two scheduled visits were cancelled through no fault of Father, he has only visited with Child once in two years, which occurred several weeks before the fact-finding hearing. Father acknowledges that his frequent incarceration has hindered his progress in this case. Despite the services offered to assist Father with reunification with Child, Father chose not to address his substance abuse issues by complying with the case plan and, as a result, was incarcerated for possession of a narcotic drug. Even following his release, Father entered work release where he committed multiple violations and was sent back to jail.

[22] Ultimately, Greenwood testified that, despite Father's recent progress, he has not demonstrated the requisite consistency to be ready to care for Child. She testified:

> I do question . . . the overall case. Like I said, two years [of non-compliance] compared to two months [of progress] and, also, when he was previously at the DuComb Center at the end of last year, just the multiple violations that he had, the positive drug screens showing that he was struggling from abstaining from using.

> I was . . . happy to hear that he was now involved in MRT. I thought that that was an accomplishment and a progression from where he was at. But after hearing that he essentially didn't finish IOP successfully to move on to MRT, he was just moved to MRT, because of how he acted in the class. I'm just

> concerned that his efforts aren't entirely genuine and maybe
> rushed at this time.

*Id*. at 186.

Lastly, we note that Father's criminal history highlights his struggle with substance abuse and instability, and ultimately demonstrates his lack of commitment, unwillingness, and inability to adequately care for Child.[3] This court has recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006) (quoting *Matter of A.C.B.*, 598 N.E.2d 570, 572 (Ind. Ct. App. 1992)), *trans. denied*. Although we commend Father for his recent improvements, this court has often noted that evidence of a parent's "pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210. In addition, a parent's failure to exercise the right to visit one's child demonstrates a lack of commitment to complete the actions necessary to preserve the parent-child relationship. *Lang*, 861 N.E.2d at 372. Unfortunately, such is the case here.

---

[3] Father has convictions for driving with an inoperative license and fictious plates, conversion, and possession of a narcotic drug.

[24] At the fact-finding hearing, when asked whether he was ready to care for Child, Father responded, "At this very moment, no. . . . I'm in DuComb. I don't have my own home. I don't have the foundation that [Child] does need. In four months ask me that question again, it will be a completely different answer." Tr., Vol. II at 213-14. Despite Father's recent progress, it is apparent that the juvenile court weighed Father's prior history more heavily – specifically, his repeated incarcerations, substance abuse, non-compliance with services, and overall instability – than any recent improvements. As our supreme court has explained,

> the [juvenile] court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions – balancing a parent's recent improvements against 'habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation.' We entrust that delicate balance to the [juvenile] court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. Requiring [juvenile] courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.

*In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quotations, citations, and footnote omitted). As such, the juvenile court was well within its discretion to "disregard the efforts [Father] made only shortly before termination and to weigh more heavily [Father]'s history of conduct prior to those efforts." *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1234 (Ind. 2013) (citing *Matter of C.M.*, 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997)

("explaining that 'it [is] within the province of the trial court, as the finder of fact, to ignore or discredit . . . evidence' of remedial efforts made shortly before the termination hearing.")). For these reasons, we conclude the juvenile court's findings supported its conclusion. *See, e.g., In re E.M.*, 4 N.E.3d at 644 (findings regarding a parent's continued non-compliance with services supported juvenile court's conclusion the conditions under which children were removed from the parent's care would not be remedied).[4]

## B. Best Interests

[25] Father also challenges the juvenile court's conclusion that termination of his parental rights is in Child's best interests. "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). In determining what is in the best interests of the child, the juvenile court must look beyond the factors identified by DCS and look to the totality of the evidence. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the juvenile court must subordinate the interest of the parents to those of the child. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). And the juvenile court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.*

---

[4] Having determined that DCS met its burden of showing that the conditions that resulted in Child's removal and continued placement outside of Father's care will not be remedied, we need not address whether DCS met its burden of proving that the continuation of the parent child relationship poses a threat to Child's well-being. *K.T.K.*, 989 N.E.2d at 1234.

Recommendations of the FCM and CASA, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interest. *In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[26] Here, CASA Deborah Sorokin and FCM Greenwood both testified that termination of Father's parental rights is in Child's best interests. *See* Tr., Vol. II at 172, 196. Sorokin testified that Child needs stability and uncertainty is bad for Child; her "concern is that [Father] doesn't have a record of being able to, . . . in the last two years . . . be drug free, to be clean. I don't know that he's had a consistent job; I don't believe he's had a consistent home. There's been nothing stable in his life that he can give to [Child] for stability." *Id.* at 196. Similarly, Greenwood opined that termination is in Child's best interests because "the longer that we keep [Child] in the system it puts his permanency at risk. He has been with [C.K.] pretty much his entire life. He knows [her], he's bonded to [her]. . . . She is able to meet his needs. And I don't feel that [Father] is ready for that at this time." *Id.* at 172. In sum, this is sufficient evidence to support the juvenile court's conclusion that termination of Father's parental rights is in Child's best interests.

# Conclusion

[27] We conclude that DCS presented sufficient evidence to support the juvenile court's order terminating Father's parental rights to Child. Therefore, the order was not clearly erroneous, and we affirm the judgment of the juvenile court.

Affirmed.

Bradford, C.J., and Altice, J., concur.